# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| Ricky Beckham, | : | Case No. 5:08CV1570 |
| Plaintiff | : | Judge Solomon Oliver, Jr. |
| v. | : | Magistrate Judge David S. Perelman |
| Commissioner of Social Security, | : | **REPORT AND RECOMMENDED DECISION** |
| Defendant | : | |

This action pursuant to 42 U.S.C. §§405(g) and 1383(c)(3) seeking judicial review of defendant's final determination denying plaintiff's claims for disability benefits, (DIB), 42 U.S.C. §§416, 423 and supplemental security income benefits (SSI), 42 U.S.C. §1381 et seq., is pending decision upon the parties' submissions on the merits, pursuant to which plaintiff seeks entry of final judgment in his favor, alternatively, an order of remand, and defendant seeks final judgment upholding the decision below.

Plaintiff's applications were filed in December 2002 (the SSI application being granted a protective filing date of November 15, 1002), alleging disability as of September 21, 2002.  In an accompanying Disability Report - Adult the questions "What are the illnesses, injuries or conditions that limit your ability to work?" and "How do your illnesses, injuries or conditions limit your ability to work?"  were answered "Brain injury, shoulders, neck, legs because of a motorcycle accident" and "Dizzy and aches, hurt to pick up arms."

Upon denial of plaintiff's claims on the state agency level hearing de novo before an Administrative Law Judge (hereinafter ALJ) was requested. Evidentiary hearing, at which plaintiff was represented by counsel, was held on December 7, 2005. Also testifying at that proceeding were a medical expert, Dr. Bruce Parker, and a vocational expert, Ms. Lynn Kaufman.[1]

When asked by the ALJ as to the basis of the plaintiff's claim of disability plaintiff's counsel, while alluding to some alleged physical impairments, stated "Your Honor, it's, it's our position, number one, first and foremost is the traumatic brain injury." When asked by the ALJ "What is keeping you from working at this time, in your own words, the plaintiff responded:

> A. I just, I'm forgetful, I still have to be remembered to do things or write it down. My shoulder pain, because it's been broke three times over the years. My feet, now that I've got, I've got the Gout and Spurs and Arthritis in my ankles and my feet. There are pretty much, some days, some days I'm alright, some days I stay in bed, and you know I stay in bed all day long, or couple hours before I can get up and move around.
>
> Q. Well, let's, let's break down some of these things. Let's start with your feet and the gout. How long have you had this problem?
>
> A. This started probably within the last year, I'm thinking.
>
> Q. And, what are the symptoms that you experience?
>
> A. Severe pain in the bottoms of my feet, feels like, maybe somebody's just, somebody's driving nails up through your feet. Toe cramps, you can't even, not even a weight of a sheet on your feet. Nothing touching whatsoever. Can't put your shoes on.

He later testified:

> Q. Mr. Beckham, can you talk, talk about the mental problems that you've had since your motor vehicle accident in 2002?

---

[1] The hearing was held by video conference, with the plaintiff and his counsel in Mansfield, Ohio and the ALJ and the two expert witnesses in Columbus, Ohio.

2

> A. My mental problems?
>
> Q. Yeah, what symptoms do you have exactly?
>
> A. I just, I sometimes can't remember. Like I said, we can't, can't remember to spell sometimes, can't remember leave the refrigerator open, leave the water on, leave the stove run, on, forget phone numbers, forget people's names.

While acknowledging that he had had a drinking problem for many years, the plaintiff maintained that he had stopped drinking about a month before the hearing because he had developed hepatitis and his doctor had told him that "I was probably going to need a new liver in two years if I didn't quit, and I probably wouldn't be here in five if I didn't get a liver."

Dr. Parker testified that he had completely reviewed the plaintiff's medical records, and that he did not find that the plaintiff met or equaled any of the Listing of Impairments. When asked by the ALJ what limitations the plaintiff would have Dr. Parker testified as follows:

> A. Well, he would have to be in a non-noisy environment because of the hearing loss, the noise and noise injury aggravate that. Because of his history of balance problems he would have, he would be limited from balancing from climbing ladders being in high places, and again because of his, again the balance hearing problems he would probably have, well it's safe for him to operate motor vehicles, he should not be around moving machinery. As far as the liver problem, [INAUDIBLE] he should not be exposed to a chemical environment where there might be some toxins.
>
> Personally, the record itself does not direct the document degree of weakness or decreased range of motion, where he speaks, but, it would appear that given the subjective history and the consistent reports of shoulder problems that there would be some cessation reaching on a consistent basis, [INAUDIBLE] or grasping, he would have to, I would think to operate push, push controls on a sustained basis, but and I don't think he could operate, again given the foot problems, on a sustained basis foot controls, [INAUDIBLE] he can only be on his feet one to two hours per day if he has some breaks. Carrying would be restricted to ten pounds, occasionally, because of the shoulder problems, balancing problems. Sitting would

> [INAUDIBLE]. Stooping and bending would a bit restricted because of balance. He would have no restrictions kneeling.
>
> Q. The memory problems, describe them in conjunction with having had head injury. Are those very consistent with traumatic brain injury?
>
> A. They are and of course would be aggravated by the alcohol. Memory problems from alcohol begin to clear after a period of abstinence in two to three months.
>
> Q. So there is potential for some improvement on that basis. He described some problems with his feet and legs, I guess, as it relates to getting up and getting out of bed in the morning, is that something that [INAUDIBLE]. Shouldn't he be able to do that, twenty days out of the month?
>
> A. Well, there's no, it's impossible to say that based on the evidence, but there is evidence of potential changes in both feet.
>
> Q. That spurring, would that cause the kind of pain that he described [INAUDIBLE].
>
> A. The spurs are described as quite small. There well may be degenerative arthritis and if the gout has not been really well [INAUDIBLE] in terms of the [INAUDIBLE].

On January 24, 2007 the ALJ entered his opinion denying plaintiff's claims. That decision became defendant's final determination upon denial of review by the Appeals Council on May 30, 2008. The ALJ's Findings, which represent the rationale of decision, were:

1. The claimant met the disability insured status requirements of the Social Security Act on September 31, 2002, the date he stated he became unable to work, and he continues to meet them through the date of this decision.

2. The claimant has not engaged in substantial gainful activity since September 21, 2002.

3. The objective medical evidence establishes that the claimant has "severe" impairments best described as degenerative joint disease of the cervical spine; an high tone sensorineural hearing loss; gastroesophageal reflux disease; alcoholic liver disease; vertigo; a

        cognitive disorder not otherwise specified status-post head injury sustained in a motorcycle accident; a depressive disorder not otherwise specified; a history of polysubstance abuse; and alcohol dependence, but that he does not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1 to Subpart P of Regulations No. 4

4. The claimant's testimony regarding his limitations was credible to the extent that he has severe impairments. However, for the reasons stated in the body of this decision, the claimant's testimony was not credible to show that he is incapable of all work activity at any exertional level.

5. The claimant retains the physical residual functional capacity for carrying no more than10 pounds. The claimant can sit without restriction as long as he has the opportunity to stand as necessary. he can stand for 1 to 2 hours total during an eight-hour workday with breaks. He can occasionally bend and stoop. He can occasionally reach. He can occasionally push and pull hand controls and operate foot controls. He is restricted to work in a non-noisy environment and must avoid chemicals/toxin. He must additionally avoid hazards such as work at unprotected heights and being around dangerous machinery. The claimant retains the mental residual functional capacity to perform work having a mildly impaired ability to understand simple directions; a moderately limited ability to comprehend complex material; a mildly impaired immediate memory and working memory; a mildly impaired ability to direct his attention effectively to tasks at hand for reasonable periods of time; a moderately impaired ability to relate with the general public, supervisors and co-workers; and mildly impaired ability to respond appropriately to novel situations and to variations in a work setting.

6. The claimant is unable to perform any past relevant work based on his current residual functional capacity.

7. The claimant is a younger person with a limited education.

8. Although the claimant has a history of skilled work, he has not acquired transferable skills to other skilled or semi-skilled work within his residual functional capacity.

9. Taking into consideration the claimant's vocational profile and his residual functional capacity and using Rules 201.25 and 201.19 of Table No. 1 of Appendix 2 to Subpart P of Regulations No. 4 as a

> framework for decisionmaking, together with the testimony f the vocational expert, the claimant is not disabled.

10. The claimant has not been under a "disability" as defined in the Social Security Act at any time since the alleged onset date of September 21, 2002 pursuant to 20 CFR 404.1520(g) and 416.920(g).

The standards which control on a review of this nature were summarized by the Sixth Circuit in Garner v. Heckler, 745 F.2d 383, 387 (6th Cir. 1984) as follows:

> Judicial review of the Secretary's decision is limited in scope to determining whether the findings of fact made by the Secretary are supported by substantial evidence and deciding whether the Secretary employed the proper legal criteria in reaching her conclusion, Walston v. Gardner, 381 F.2d 580, 585 (6th Cir. 1967). This Court may not try the case de novo, nor resolve conflicts in evidence, nor decide questions of credibility, Myers v. Richardson, 471 F.2d 1265 (6th Cir. 1972). Rather "[t]he findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive..." 42 U.S.C. §405(g).
>
> The Supreme Court has stated that "substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). Substantiality of the evidence must be based upon the record taken as a whole. Allen v. Califano, 613 F.2d 139, 145 (6th Cir. 1980), citing Futernick v. Richardson, 484 F.2d 647 (6th Cir. 1973). "Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the `substantiality of evidence must take into account whatever in the record fairly detracts from its weight'." Beavers v. Secretary of Health, Education and Welfare, 577 F.2d 383, 387 (6th Cir. 1978), quoting Universal Camera Corp. v. N.L.R.B., 340 U.S. 474 (1951). "We may not focus and base our decision entirely on a single piece of evidence, and disregard other pertinent evidence." Hephner v. Mathews, 574 F.2d 359, 362 (6th Cir. 1978).

substantial evidence the decision upon judicial review cannot turn upon whether the reviewing court agrees with the Secretary's determination. Indeed, the reviewing court may conclude that substantial evidence would support a final determination contrary to that arrived at by the defendant and yet be obliged to affirm the defendant's final determination. In Mullen v. Bowen, 800 F.2d 535, at 545 (6th

Cir. 1986), the court cited with approval the following from Baker v. Heckler, 730 F.2d 1147, 1150 (8th Cir. 1984):

> The substantial-evidence standard allows considerable latitude to administrative decision makers. It presupposes that there is a zone of choice within which the decision makers can go either way, without interference by the courts. An administrative decision is not subject to reversal merely because substantial evidence would have supported an opposition decision.

On this appeal under the general heading of "The Administrative Law Judge's Finding That Plaintiff Is Not Disabled Is Not Supported By Substantial Evidence" plaintiff's counsel advances the specific arguments that "The ALJ's mental residual functional capacity was improperly devised and was not supported by substantial evidence" and "The ALJ's ultimate conclusion did not have the support of substantial evidence." Each of these focuses upon the plaintiff's mental capacity, and neither challenges the ALJ's determination that the plaintiff retains the exertional capacity for a limited range of sedentary work. The second, to a fair degree, ties into the first, in that it is argued that the ALJ improperly failed to include in his hypothetical question to the vocational expert the mental limitations from which the plaintiff suffers.

In arguing that the ALJ incorrectly assessed the plaintiff's mental limitations his counsel places primary reliance upon the report of a neuropsychological evaluation performed by Dr. Greg A. Martin on January 3, 2004,[2] upon referral of the plaintiff's Ohio Rehabilitation Services Commission Case Manager.

---

[2]Plaintiff's brief states that Dr. Martin's report "was not submitted for the consideration of the ALJ or ME until after the hearing." Considering that the report was prepared almost two years before the hearing and bears an exhibit number reflecting that it was a part of the record before the ALJ this Court is at a loss to understand that representation. This Court notes that the report states that Dr. Martin recommended to the plaintiff that he release the report to two physicians who had treated the plaintiff "as well as his own Social Security attorney," the plaintiff having made the doctor aware of the fact that he was pursuing claims for disability benefits.

7

In this Court's opinion, for several reasons that report fails to support the argument that the plaintiff is entitled to the benefits he seeks.

To begin with, there is a question from the face of the report as to its reliability.  Under the heading of VIP Scales the following appears:

> These tests are designed to measure effort and motivation in neuropsychological examination settings.  Six indices are used on each of the two subtests (verbal and nonverbal) to gauge the likelihood that the person expended adequate effort on other neuropsychological testing.
>
> Unfortunately, Mr. Beckham failed all six indices from the verbal subtest, strongly calling into question his effort and follow-through on other tests.  Failure on these six indices only occurs due to inadequate effort excepting rare occasions where the person is illiterate (clearly not occurring with regards to Mr. Beckham) or have severe mental retardation or cognitive deficits due to severe neurologic injury or illness (also clearly not occurring with Mr. Beckham).  The fact that he passed the nonverbal subtests does not change my conclusions here.  It merely indicates he was inconsistent with his effort while at other times apparently giving good effort.

Dr. Martin also expressed some concern as to the results of MMPI testing, but did state "I have less concern about overall validity because he did so well on some tests especially memory tests.  If he clearly was attempting to 'fake bad' I would have expected him to do so on memory tests. Moreover, my recommendations remain the same even if I judged the examination to be invalid."

Dr. Martin's reference to the plaintiff doing well on memory tests is particularly interesting, considering that a large part of the plaintiff's alleged disabling mental impairment is difficulty with memory.  Pertinent to this is the following portion of the report:

> The only evidence of memory problem was seen on the Mack Verbal and Visual Recognition Memory Tests.  Here, he scored just below the cutoff between low average and mildly impaired range functioning.  Both of these tests have more attentional demands than the CVLT or the recall of the visual copy.  These findings, as well as

8

>that of the battery of attention and concentration tests lead me to
>conclude that Mr. Beckham's complaints about short-term memory
>are due almost exclusively to attention impairments and not memory
>per se.

In this Court's opinion, Dr. Martin's conclusion that "Overall, I do not believe Mr. Beckham will return to work" does not represent his belief that the plaintiff suffers from mental impairments that preclude the plaintiff from working.  It is plain that such conclusion is predicated upon the fact that the plaintiff perceives himself as disabled, Dr. Martin stating "The combination of his previous alcohol dependence disorder, his current mood and coping problems, the newly acquired cognitive deficits as well as his physical impairments <u>all leave him feeling completely disabled</u> " (emphasis added).  Notwithstanding Dr. Martin's view that the plaintiff perceived himself as disabled, he stated that although he did not believe that the plaintiff could be retrained for skilled work "Mr. Beckham's current cognitive strengths and weaknesses will allow him, when speaking merely of cognitive issues, to work in semi or unskilled positions.  He would do best with repetitive duties such as on an assembly line or machine shop.  Because of his impaired attention, I do not recommend work on machines that have any kind of significant safety issues.  He is prone to distractibility and he would have to have duties where an inadvertent mistake would not result in high risk of physical harm."

There is also the consideration that, as noted by the ALJ, Dr. Martin's opinion takes into consideration the plaintiff's asserted physical impairments, an area that as a neuropsychologist he is not qualified to speak to and which apparently rests upon the plaintiff's recitation to Dr. Martin of his alleged physical impairments and the limitations secondary thereto.

While all of the foregoing is material to the weight which might be accorded to Dr. Martin's assessment of the plaintiff vis-a-vis the plaintiff's claim of disability, perhaps the most significant factor militating against a finding of disability based upon that report is the repeated references

therein to the plaintiff's well documented history of alcohol abuse which, by the plaintiff's own admission, continued almost up to the time of the evidentiary hearing.  At various points in the report the following appear:

> Adding to these difficulties is the fact Mr. Beckham has a longstanding alcohol dependence problem with four DUIs and successful completion of a chemical dependency program after the 2002 accident.
>
> \* \* \*
>
> Other health issues relevant to today's examination is the fact that Mr. Beckham has relapsed in his sobriety.  He report drinking daily averaging about a six-pack.  He claims that he does so to aid with sleep.
>
> \* \* \*
>
> These findings are not particularly surprising given Mr. Beckham's struggle with alcohol dependence.  People with this difficulty notoriously have difficulty acknowledging psychological problems, tend to blame others for their predicament, and generally struggle with objectively rating their emotional status.
>
> \* \* \*
>
> The current pattern of cognitive deficits is entirely consistent with a traumatic brain injury and especially with frontal lobe dysfunction.  Attention and the judgment and reasoning skills are handled primarily by frontal lobe structures.  It is also possible that the heavy alcohol use history as well as at least one previous concussion also is contributing.  I do not believe, however, that the alcohol use is a primary culprit since it tends to result in short-term memory problems more so than any other type of deficit.  Mr. Beckham's test results suggest actual quite solid memory skills.
>
> \* \* \*
>
> Mr. Beckham continues to drink daily and outside of what is deemed to be moderation.  I do believe he continues to have a significant alcohol dependence disorder despite the fact that the reportedly has cut back from peak input from before the motorcycle accident.

* * *

>It is my strongest recommendation to Ms. Evans and Mr. Beckham that Mr. Beckham commit to sobriety again. This will likely require additional alcohol treatment and including more follow-up than Mr. Beckham is willing to take on after his last treatment effort. The summary report from his alcohol treatment program indicated that he never participated in AA, did not follow-up with a sponsor, and in short cut himself off from the transition supports that can make all the difference in a successful sobriety program.

* * *

>I strongly recommend that the Rehabilitation Services Commission hinge any further support, monies, and time on Mr. Beckham's willingness to become sober again. Without that, I believe there is little hope.

42 U.S.C. §§423(d)(2)(C) and 1382c(a)(3)(J) provide that "An individual shall not be disabled for purposes of this subchapter if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled." Dr. Martin's report would certainly appear to bring the plaintiff within this disqualifying provision.

Also consistent with the ALJ's determination that the plaintiff does not suffer from impairments preclusive of all work activities are an evaluation performed by the Career Assessment Systems in June 2003, a report from the plaintiff's treating osteopathic physician dated May 8, 2003 in which the doctor stated that the plaintiff was "doing very well" and restricted the plaintiff from performing "his heavy duty manual labor until September of 2003," and a report of a psychological evaluation performed by Dr. Gary J. Sipps in September 2003 which concluded with the statement that "His overall functioning is at a mildly reduced level of efficiency given his current treatment regimen."

11

In this Court's opinion the ALJ's determination that the plaintiff is not disabled was unquestionably within his zone of choice. It is, accordingly recommended that final judgment be entered in defendant's favor.

s/DAVID S. PERELMAN
United States Magistrate Judge

DATE: July 14, 2009

## OBJECTIONS

Any objections to this Report and Recommended Decision must be filed with the Clerk of Courts within ten (10) days of receipt of this notice. Failure to file objections within the specified time waives the right to appeal the District Court's order. *See, United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See, also, Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).